PILLSBURY WINTHROP SHAW PITTMAN LLP
Kenneth W. Taber
Joshua I. Schlenger
1540 Broadway
New York, New York 10036
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
E-mail:  kenneth.taber@pillsburylaw.com
         joshua.schlenger@pillsburylaw.com

*Attorneys for Plaintiff*
*IMS Health Incorporated*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IMS HEALTH INCORPORATED,<br><br>                    *Plaintiff*,<br><br>          v.<br><br>AMP ASSOCIATES LLC, J. PETER BARDWICK, CHRIS CONWAY, WILLIAM B. HORNE, HOURGLASS LAKE PARTNERS, JON KAIDEN, KAIDEN INVESTMENT GROUP, LLC, PAUL HOLDINGS LLLP, PATRICK PLUMMER, TIM SLEVIN, and CHARLES STRYKER,<br><br>                    *Defendants*. | Civil Action No. 16-cv-07056 (AKH)<br><br>**AMENDED COMPLAINT** |

          Plaintiff IMS Health Incorporated ("IMS Health"), by its attorneys Pillsbury Winthrop

Shaw Pittman LLP, brings this Amended Complaint against the former shareholders (the

"Sellers") of Grace Data Corporation d/b/a Healthcare Data Solutions ("HDS" or the

"Company") for breach of contract and indemnification, and respectfully alleges as follows:

## NATURE OF THE ACTION

1.      This action arises out of the Sellers'[1] wrongful conversion of their own pre-closing tax obligations into post-closing tax burdens imposed on IMS Health, in clear breach of the parties' Share Purchase Agreement, made and entered into as of July 15, 2015 (the "SPA").[2]

2.      That breach now threatens to impose over $2 million in undeserved tax obligations on IMS Health, a substantial sum on a standalone basis, and a substantial sum in relation to the purchase price paid for the business.

3.      The SPA by and among IMS Health, HDS, the Sellers, and Jon Kaiden, as the representative of the Sellers (the "Sellers' Representative"), provided for the purchase by IMS Health of all of the stock of HDS from HDS' former shareholders (the "Purchase Transaction").

4.      The parties unambiguously agreed in the SPA that the Sellers, and the Sellers alone, would be responsible for paying all taxes attributable to the period up to and including the closing date of the Purchase Transaction.  IMS Health would only be responsible for paying those taxes attributable to the post-closing period.

5.      Due to the unauthorized elections made post-closing by the Sellers in connection with HDS' tax filings, substantial revenues received by HDS in the pre-closing period were shifted to the post-closing period, for which IMS Health is responsible to pay taxes.  This resulted in a tax liability for IMS Health on revenues earned pre-closing and for which IMS Health received no economic benefit.

---

[1]  The Sellers are defendants AMP Associates LLC, J. Peter Bardwick, Chris Conway, William B. Horne, Hourglass Lake Partners, Jon Kaiden, Kaiden Investment Group, LLC, Paul Holdings LLLP, Patrick Plummer, Tim Slevin, and Charles Stryker.

[2]  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the SPA.  Pursuant to the confidentiality provisions of the SPA, and in accordance with this Court's order entered on September 14, 2016 (ECF No. 6), IMS Health is not filing a copy of the SPA or other documents referenced in this Amended Complaint.

6.     Had IMS Health understood that it, rather than the Sellers, would be saddled with taxes attributable to the pre-closing period, it would have insisted upon a substantial decrease in the purchase price.

7.     During pre-closing due diligence, HDS specifically assured IMS Health that (1) HDS had made no change in its method of accounting for advance payments received during the 2013 tax year (the last year for which a return had been filed), and (2) HDS would not make any such election deferring recognition of the advance payments received in 2013.  Those assurances formed the basis of several carefully negotiated provisions in the SPA.

8.     Contrary to those assurances and agreements, however, through post-closing changes the Sellers unilaterally made to HDS' method of accounting for advance payments for U.S. federal income tax purposes, IMS Health now finds itself saddled with more than $2 million in undeserved tax liabilities.

9.     To protect IMS Health from such unanticipated tax liabilities following the closing of the Purchase Transaction, the parties expressly agreed upon a detailed tax-return filing and amendment mechanism in the SPA.  Specifically, the parties agreed that, after the closing of the Purchase Transaction, the Sellers' Representative would not file *any* amendment to HDS' 2013 tax return, nor file HDS' 2014 tax return, without first providing IMS Health substantially final drafts of such tax returns at least fifteen (15) business days prior to the due date.  The SPA then afforded IMS Health the right to object to such draft returns or amendments, and unambiguously required that no such tax returns be filed until IMS Health provided its consent.

10.    But the Sellers and the Sellers' Representative deliberately breached all of the foregoing obligations:

(a)     *First*, the Sellers failed to follow the procedure for filing an amended HDS tax return for 2013 and then filing the HDS 2014 tax return.

(b)     *Second*, the Sellers and the Sellers' Representative failed to prepare and file HDS' 2014 return in accordance with the requirements and specifications set forth in the SPA.

(c)     *Third*, the Sellers and the Sellers' Representative deliberately failed to provide IMS Health a substantially final draft of HDS' 2014 federal income tax return 15 Business Days prior to the filing date, as required by the SPA.

(d)     *Fourth*, HDS never sought, let alone obtained, IMS Health's consent to ignore the foregoing contractually bargained-for requirements.

11.     As a direct result of the Sellers' breaches, IMS Health must now include over $5 million in additional income on its own post-Purchase Transaction federal income tax returns, and faces over $2 million in undeserved additional tax liability.

12.     In addition to the specific procedures agreed to in order to address the 2013 and 2014 tax returns, the SPA expressly required that the Sellers indemnify IMS Health for tax liabilities resulting from the Sellers' breaches of representations and/or covenants contained in the SPA.

13.     As of the date of this Amended Complaint, IMS Health has twice written to the Sellers' Representative to demand indemnification of its excess tax liability attributable to the Sellers' breach of the foregoing covenants and representations under the SPA (the "Claim").

14.     On both occasions, IMS Health's demands have been rebuffed.

15.     IMS Health is therefore left with no choice but to file the present action to recoup from the Indemnity Escrow Fund:

    (a)     All damages sustained as a result of the Sellers' breaches, in an amount to be determined at trial, but in no event less than $2 million, together with prejudgment interest thereon; and

    (b)     All attorneys', accountants', and other advisors' fees incurred by IMS Health in pursuing the Claim and the instant action.

## PARTIES

16.     Plaintiff IMS Health is a Delaware corporation with its corporate office at 83 Wooster Heights Road, Danbury, Connecticut 06810.  IMS Health is a leading global information and technology services company providing clients in the healthcare industry with comprehensive solutions to measure and improve their performance.

17.     Upon information and belief, Defendant AMP Associates LLC is a Delaware limited liability company with its principal place of business located at 601 Lexington Avenue, New York, New York 10022.  Upon information and belief, none of the members of Defendant AMP Associates LLC is a citizen of Connecticut or Delaware.

18.     Upon information and belief, Defendant J. Peter Bardwick is an individual domiciled within the State of California.

19.     Upon information and belief, Defendant Chris Conway is an individual domiciled within the State of California.

20.     Upon information and belief, Defendant William B. Horne is an individual domiciled within the State of California.

21.     Upon information and belief, Defendant Hourglass Lake Partners is a Delaware limited partnership.  None of the partners of Defendant Hourglass Lake Partners, upon information and belief, is a citizen of Connecticut or Delaware.

22.     Upon information and belief, Defendant Jon Kaiden is domiciled within the State of New York, County of New York.  Mr. Kaiden, upon information and belief, is a principal and founding member of Sopris Capital Associates, LLC, a Delaware limited liability company with its principal place of business located at 601 Lexington Avenue, 55th Floor, New York, New York 10022.  Mr. Kaiden also serves as the Sellers' Representative under the SPA.  In that capacity, he is a party to the SPA, but solely to perform certain administrative functions in connection with the consummation of the transactions contemplated thereby.  As set forth in the SPA, these administrative functions include the obligations to receive notices and accept service of process on behalf of the Sellers.

23.     Upon information and belief, Defendant Kaiden Investment Group, LLC is a Delaware limited liability corporation, with its principal place of business located at 601 Lexington Avenue, New York, New York 10022.  Upon information and belief, Defendant Jon Kaiden is a member of Defendant Kaiden Investment Group, LLC.  None of the members of Defendant Kaiden Investment Group, LLC, including Jon Kaiden, is, upon information and belief, a citizen of Connecticut or Delaware.

24.     Upon information and belief, Defendant Paul Holdings LLLP is a Florida limited liability limited partnership with its principal place of business at 16336 Tudor Lake Court, Orlando, Florida 32828.  Upon information and belief, none of the partners of Defendant Paul Holdings LLLP is a citizen of Connecticut or Delaware.

25.     Upon information and belief, Defendant Patrick Plummer is an individual domiciled within the State of California.

26.     Upon information and belief, Defendant Tim Slevin is an individual domiciled within the State of California.

27.     Upon information and belief, Defendant Charles Stryker is an individual domiciled within the State of New York.

## JURISDICTION AND VENUE

28.     Upon information and belief, there is complete diversity between the parties here, and the amount in controversy is in excess of $75,000, exclusive of interest and costs.  This Court therefore has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

29.     Venue is proper in this District because, under the SPA, the parties:

(a)     expressly agreed that any legal action or other proceeding relating to the SPA or the enforcement of any provision of the SPA shall be brought or otherwise commenced exclusively in any state or federal court located in the Borough of Manhattan, City of New York;

(b)     expressly and irrevocably consented and submitted themselves to the jurisdiction of each state and federal court located in the Borough of Manhattan, City of New York (and each appellate court located in the City of New York), in connection with any such proceeding;

(c)     expressly agreed that each state and federal court located in the Borough of Manhattan, City of New York, shall be deemed to be a convenient forum; and

(d)     expressly agreed not to assert (by way of motion, as a defense or otherwise), in any such proceeding commenced in any state or federal court located in the Borough of Manhattan, City of New York, any claim by any Seller or by IMS Health that it is not subject personally to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that the SPA or the subject matter of the SPA may not be enforced in or by such court.

## FACTUAL ALLEGATIONS

### A.     IMS Health and HDS Sign the LOI

30.     On May 29, 2015, Duane Sachs, Vice President and Global Head of Corporate Development at IMS Health, sent a signed LOI to William Horne, the President and CEO of

HDS.  Both Mr. Horne and Mr. Kaiden, the latter in his capacity as an HDS shareholder and President of Sopris Capital, then counter-signed the LOI.

31.     Through the LOI, IMS Health made a non-binding offer to acquire 100% of the capital stock of HDS, subject to the terms and conditions described therein.

32.     The LOI indicated that the purchase price was based on IMS Health's preliminary assessment of the Company, its market position, and its financials, following IMS Health's review of certain materials provided by the Sellers, and initial discussions between IMS Health and the Sellers.  The purchase price was subject to IMS Health's due diligence review.

33.     The principle that IMS Health would not be subject to taxes attributable to the pre-closing period was deeply embedded in the LOI.  Had IMS Health known, or discovered during its due diligence, that it would be responsible for taxes attributable to the pre-closing period, it would have proposed a downward adjustment to the purchase price originally reflected in the LOI to reflect those tax liabilities.

**B.     As Part of Pre-closing Due Diligence, the Parties Specifically Discussed Any HDS Deferral of Advance Payments**

34.     Between May 29 and July 15, 2015, IMS Health engaged in due diligence regarding HDS, and the parties negotiated, and finalized, the terms of the SPA.  HDS furnished due diligence materials requested by IMS Health in a dataroom.

35.     IMS Health's advisor, Ernest & Young LLP ("E&Y"), discovered during its review of the materials in that dataroom that, with its 2013 tax return, HDS had filed a Form 3115 (Application for Change in Accounting Method) to change its overall method of accounting for U.S. federal income tax purposes from the cash method to the accrual method, effective January 1, 2013.

36.     E&Y noted, however, that HDS had not concurrently requested on its Form 3115 an accounting method change to the deferral method for *advance* payments, nor did HDS comply with the requirements for making such an advance payments election, as set forth by the Internal Revenue Service ("IRS") in Revenue Procedure 2004-34.

37.     Though E&Y did not find the required elements for a proper Form 3115 election to defer recognition of advance payments received in 2013, E&Y did observe that the calculations on the Form 3115 HDS had filed for 2013 erroneously seemed to assume that an election to defer advance payments had been made.  E&Y also noted that there were mathematical errors on the HDS Form 3115 for 2013.

38.     Concerned about the foregoing errors in HDS' 2013 Form 3115, IMS Health directly asked HDS whether HDS could provide evidence of any such election to defer advance payments starting with the 2013 tax year.  On or about July 13, 2015, HDS responded to IMS Health that HDS had made no election, and was following Revenue Procedure 2004-34. (Revenue Procedure 2004-34 is the guidance issued by the IRS permitting taxpayers to choose either the "full inclusion" or "deferral" methods of tax accounting for advance payments for purposes of calculating federal tax liabilities; it provides administrative and procedural guidance on how to change from one method to the other.)

39.     Upon reviewing that HDS response, E&Y concluded that a proper change to the method of accounting for advance payments had not been made, and that HDS should not have included advance payments as one of its adjustments on its Form 3115.

40.     Accordingly, on or about July 14, 2015, IMS Health—through its counsel—informed HDS that IMS Health needed two contractual protections in the SPA to ensure that

HDS' 2013 Form 3115 (1) would in no way reflect an election to defer advance payments, and (2) would correct the mathematical errors uncovered by E&Y in the Form 3115.

41.    IMS Health insisted that the Sellers, following the closing, amend HDS' 2013 return to correct the aforementioned errors, which return would then be subject to review and consent by IMS Health and its tax advisers.

42.    IMS Health further insisted that, following the filing of HDS' amended 2013 federal income tax return, the Sellers prepare HDS' 2014 federal income tax return in a manner consistent with that amended 2013 return, and that the Sellers file that 2014 return only after receiving IMS Health's consent.

43.    Finally, IMS Health insisted that the Sellers set aside monies in a Special Tax Indemnity Escrow Fund, to be created under the SPA, to cover the increased tax liability IMS Health would incur as a result of its 2013 Form 3115, after taking into account HDS' mathematical errors.

44.    IMS Health's counsel explained to HDS that, had IMS Health known that HDS' original Form 3115 for 2013 would increase IMS Health's post-closing tax liability, IMS Health would have insisted on a substantial decrease in the purchase price set forth in the LOI.

45.    HDS agreed to incorporate each of these additional protections for IMS Health into the SPA, and further agreed that IMS Health (1) would not be responsible for payment of HDS taxes attributable to the pre-closing period, and (2) would have adequate opportunity to review, comment on, and provide (or withhold) consent to HDS' amended Form 3115 for 2013 and 2014 federal tax return, to ensure, *inter alia*, that IMS Health would not bear any undeserved tax liabilities attributable to the pre-closing period.

**C.      IMS Health and HDS Enter Into the SPA**

46.     On July 15, 2015, IMS Health, HDS, each of the then-shareholders of HDS, as Sellers, and Jon Kaiden, as the Sellers' Representative, entered into the SPA.

47.     The SPA contained a series of detailed tax-related representations made by the Sellers.  In particular, the Sellers represented that HDS would not be required to include any item of income in taxable income for any taxable period ending after the July 15, 2015 closing date (the "Closing Date") as a result of:  (1) a change in method of accounting for any period ending on or prior to the Closing Date, or (2) any prepaid amount received on or prior to the Closing Date.

48.     The parties further agreed that the Sellers would be responsible for paying all HDS-related taxes attributable to periods prior to and including the Closing Date, with IMS Health only responsible for paying HDS-related taxes attributable to periods following the Closing Date.

49.     Given the results of IMS Health's due diligence, the SPA recounted the tax issues and errors in HDS' 2013 federal income tax return described above, and memorialized the parties' agreement as to how to remedy those errors.

50.     The SPA provided that any implicit deferral election for advance payments would be expunged from HDS' 2013 tax return and, in turn, that no election for deferral of advance payments would be made in the 2014 tax return.

51.     The SPA also expressly provided that HDS' 2013 amended tax return would be filed prior to HDS' 2014 tax return—and that the filing of both returns would require IMS Health's consent.  The Sellers were to file HDS' 2014 federal income tax return in a manner consistent with the amended 2013 return.

52.     The Sellers concurred that no deferral election was properly made on HDS' 2013 return, agreeing to the revised adjustment contained in the SPA, which excluded any such deferral of advance payments, and agreeing to the related escrow based on that same adjustment.

53.     To ensure that IMS Health would have an adequate opportunity to confirm that the Sellers had not filed any tax returns or related documents that saddled IMS Health with undeserved tax liability, and to ensure that the process set forth in the SPA (eliminating any implicit deferral of advance payments for 2013 and precluding any 2014 deferral) was followed, the SPA further provided that IMS Health would be guaranteed an adequate opportunity to review, comment on, and consent to (or withhold consent from) any post-closing tax returns prepared by the Sellers pertaining to pre-closing periods.

**D.      The Sellers Breach Their Obligations Under the SPA**

54.     The Sellers' post-closing tax filing activities clearly violated the SPA.

55.     Had the Sellers complied with the SPA, IMS Health would have had the opportunity to review and comment on HDS' 2013 amended federal income tax return and 2014 federal income tax return, and would have demanded compliance with the procedures set forth in the SPA.  Those procedures, if followed, would never have required IMS Health to recognize as taxable income in a post-closing period advance payments received by HDS in a pre-closing period.

56.     Contrary to the SPA, the Sellers did not file an amended 2013 federal income tax return for HDS that reflected a proper adjustment under 26 U.S.C. § 481(a) ("Section 481(a)"), or the correction of the deferral of advance payments.  The Sellers instead proceeded to prepare, and file, an erroneous 2014 tax return.

57.     Upon information and belief, the Sellers never actually amended their 2013 tax return to make the corrections called for by the SPA.

58.     The manner in which the Sellers prepared and filed HDS' 2014 tax return also represented a clear violation of the procedural and substantive requirements of the SPA.  In violation of the SPA, HDS' 2014 federal income tax return was not filed in a manner consistent with the to-be-amended 2013 return, as required.  In addition, HDS filed its 2014 federal income tax return without first obtaining IMS Health's consent, and without reflecting the updated second ratable portion of the Section 481(a) adjustment, as required by the SPA.

59.     In clear violation of the SPA, IMS Health was not provided a substantially final draft of HDS' 2014 federal income tax return and accompanying IRS submissions at least 15 Business Days prior to the due date.  Nor did IMS Health consent to the 2014 HDS federal income tax return and accompanying IRS submissions that were ultimately filed.

60.     The due date for HDS' 2014 federal income tax return was September 15, 2015. On September 10, 2015, three business days prior to that due date, Mitch Wilson, Senior Manager of Finance at HDS, notified Maryanne Piorek, then U.S. Tax Director at IMS Health, of HDS' intention to file its 2014 U.S. federal income tax return, adding that HDS would be taking actions to resolve the 2013 tax issue (the "September 10 Communication").

61.     The proposals set forth by Mr. Wilson in his September 10 Communication were contrary to the detailed process previously agreed to by the parties in the SPA in at least four respects:

(a)     The SPA required that the Sellers' Representative file the amendment to HDS' 2013 federal income tax return *before* filing HDS' 2014 federal income tax return. This sequencing was the product of negotiations with the Sellers.  IMS Health never consented to any departure from this sequencing.

13

(b)      The SPA precluded the Sellers from filing a Form 3115 requesting an accounting method change to the deferral method for advance payments in either HDS' amended 2013 federal income tax return or its 2014 federal income tax return.  To the contrary, it required the Sellers *not* include a deferral of advance payments election in its amended 2013 tax return, and required that the 2014 return be prepared consistent with the amended 2013 return.

(c)      The SPA required that any returns filed by the Sellers be completed in a manner consistent with past practice of HDS with respect to tax returns concerning the income, properties, or operations of HDS.  HDS did not have a past practice of deferring advance payments and, thus, any election regarding that alternate method of accounting was inconsistent with HDS' past practice.

(d)      The September 10 Communication was submitted to IMS Health a mere three (3) business days prior to the due date for the 2014 return—and did not even include a complete draft of the return the Sellers proposed to file.

62.      At no time prior to September 10, 2015, did HDS or the Sellers' Representative inform IMS Health that a Form 3115 requesting an accounting method change to the deferral method for advance payments would be filed together with any tax return.  To the contrary, HDS previously assured IMS Health that HDS had not made such an election for the 2013 tax year, and expressly agreed to the process set forth in the SPA, which excluded any such election.

63.      Neither the Sellers nor the Sellers' Representative ever received IMS Health's consent to deviate from the SPA.

64.      The September 10 Communication gave no indication that HDS' 2014 tax return would include a deduction for almost $5 million in "advance payments."

14

65.     Contrary to the specific timing requirements set forth in the SPA, IMS Health was not provided a substantially final draft of HDS' 2014 federal income tax return until 1:54 a.m. on September 15, 2015—the same day HDS' 2014 federal income tax return was due to be filed with the IRS.  At 1:54 a.m. on the day the return was due to be filed, John Wyson, HDS' accountant, e-mailed a copy of that return to Ms. Piorek of IMS Health.

66.     Mr. Wyson never sent IMS Health a draft of the Form 3115 referenced in the September 10 Communication.

67.     IMS Health never consented to the draft of HDS' 2014 federal income tax return that Mr. Wyson sent Ms. Piorek at 1:54 a.m. on September 15, 2015.

68.     Upon information and belief, on or about September 15, 2015, HDS' 2014 federal income tax return, including a Form 3115 electing a change in accounting method relating to advance payments, was filed with the IRS.

69.     As a direct result of the unauthorized Form 3115 filed in conjunction with the HDS 2014 federal income tax return, IMS Health is now required to recognize as taxable income in its first post-closing taxable period amounts previously includable in HDS' federal taxable income for the tax period immediately prior to the closing.  Because this election was made by the Sellers post-closing, IMS Health was denied the opportunity to consider the negative effects of this election when negotiating the Purchase Transaction or the purchase price.

70.     The filing of the unauthorized Form 3115 for 2014 and the unauthorized 2014 federal income tax return with the IRS violated the SPA.

71.     As a direct result of the filing of the HDS 2014 Form 3115, IMS Health is now required to take into account more than $5 million in taxable income in the first post-closing taxable period, without realizing any economic benefit with respect to that amount.  Indeed, the

Sellers received all of the economic benefits from those advance payments, with IMS Health alone now bearing all of the associated federal income tax burden.

72.     Had IMS Health known that an election to defer advance payments was to be made, it would have negotiated a substantial adjustment to the purchase price to take into account the additional income tax liabilities resulting therefrom.  Because that election was made only after the closing of the Purchase Transaction, IMS Health was not afforded an opportunity to demand any such adjustment to the purchase price.

**E.     The Sellers Agreed to Indemnify IMS Health for Losses Resulting from Breaches of Representations and Covenants Made in the SPA**

73.     Under the SPA, each Seller severally agreed to indemnify, defend, and hold IMS Health harmless from any breach of any covenant of the Sellers in the SPA, and any losses, damages, costs and reasonable expenses, including reasonable fees and expenses of counsel, incurred both in connection with the defense or prosecution of any indemnifiable claim and in connection with any enforcement of the indemnification provision.

74.     In addition, under the SPA, the Sellers agreed, jointly and severally, to indemnify, defend, and hold IMS Health harmless from and in respect of any and all Losses that it may incur arising out of or due to any breach of any representation or warranty of the Sellers contained in the SPA, and taxes of or relating to the Company for any tax period that ends on or before July 15, 2015, and the portion through the end of July 15, 2015 for any taxable period that includes (but does not end on) that date.

75.     The parties further agreed in the SPA to create an indemnity escrow fund to which IMS Health would resort in the first instance for satisfaction of its claims for indemnification.

76.     The inclusion of over $5 million in additional income in IMS Health's post-acquisition federal income tax returns is expected to cause IMS Health to suffer federal income

tax liability in excess of $2 million (using an effective tax rate of 40%—the same rate previously used by the Sellers' Representative and IMS Health to calculate potential tax liabilities). This tax liability is the direct result of the Sellers' breach of their covenants in the SPA, and therefore qualifies as a loss for which IMS Health is entitled to indemnification from the Sellers.

77.    The tax liabilities incurred by IMS Health as a result of HDS' 2014 return and the Form 3115 filed contemporaneously therewith are also taxes of or relating to HDS for a tax period that ends on or before July 15, 2015, for which IMS Health is entitled to indemnification under the SPA.

78.    IMS Health has also incurred, and continues to incur, attorneys' fees, accountants' fees, and advisors' fees in analyzing and pursuing the Claim. Such fees and expenses likewise constitute losses for which IMS Health is entitled to be indemnified under the SPA.

**F.    The Sellers' Representative Refuses to Indemnify IMS Health**

79.    On January 8, 2016, IMS Health's counsel sent an initial letter to the Sellers' Representative, copying HDS' counsel Wiggin and Dana LLP, and Fifth Third Bank, the Escrow Agent under the SPA (the "Initial IMS Health Letter").

80.    In the Initial IMS Health Letter, IMS Health recounted the Sellers' breaches of the SPA described above and notified the Sellers' Representative that, as a result of the accounting method change with respect to deferred revenue made contemporaneous with HDS' 2014 federal income tax return, IMS Health will be obligated to include over $5 million in additional income in post-acquisition tax periods, even though these amounts relate to pre-acquisition period cash revenues.

81.    The Initial IMS Health Letter explained that the filing of HDS' 2014 return and the 2014 Form 3115 constituted an indemnifiable event under the SPA. The Initial IMS Health

Letter concluded that the Sellers were required to indemnify IMS Health for all excess tax liability IMS Health incurred as a result of HDS' improperly prepared and filed 2014 tax return and Form 3115.

82.     On February 24, 2016, HDS' accounting firm, Wyson & Co., sent IMS Health a letter in response to the Initial IMS Health Letter (the "Wyson Letter").  The Wyson Letter acknowledged that the Sellers should have first filed an amendment to HDS' 2013 tax return to eliminate the adjustment for deferral of advance payments, and thereafter filed the 2014 return consistent with the corrected 2013 filing.

83.     Despite this admission, the Wyson Letter denied that the Sellers had breached the SPA and further disputed that the Sellers were required to indemnify IMS Health for any excess tax liability incurred by IMS Health in connection with HDS' 2014 tax return or Form 3115.

84.     The Wyson Letter made multiple incorrect assertions, including an assertion that IMS Health knew the deferral position that HDS planned to take on its 2014 return.  In truth, as noted above, the SPA clearly provided that *no* deferral election was to be made on either the 2013 amended return or the 2014 return.

85.     The Wyson Letter further asserted that the tax positions taken as a result of HDS' deferral election were only temporary in nature, and that, over time, advance payments received in one period but recognized for tax purposes in another period would be neither disregarded nor double counted.  This assertion was wholly incorrect because HDS had been purchased by IMS Health.  Indeed, as a result of HDS' deferral election, IMS Health is now required to assume a tax liability with respect to cash amounts for which it has received no economic benefit.

86.     On June 20, 2016, IMS Health's counsel sent the Sellers' Representative a follow-up letter (the "Second IMS Health Letter"), once again copying HDS' counsel and the Escrow Agent.

87.     The Second IMS Health Letter reiterated and expanded on the points in the Initial IMS Health Letter, refuted the responses in the Wyson Letter, restated IMS Health's demand for indemnification under the SPA, and requested that the Sellers' Representative, no later than July 15, 2016, join IMS Health in executing a joint written instruction to Fifth Third Bank (the "Escrow Agent") to release the claimed amount to IMS Health from the Indemnity Escrow Fund.

88.     The Second IMS Health Letter attached a formal notice to the Escrow Agent (the "Claims Notice"), informing the Escrow Agent of IMS Health's Claim and directing the Escrow Agent to release and pay to IMS Health the claimed amount out of the Indemnity Escrow Fund, unless the Escrow Agent should receive a timely response notice from the Sellers' Representative.

89.     On July 14, 2016, the Sellers' Representative transmitted a formal response notice to the Claims Notice, denying any liability for the amounts claimed in the Claims Notice and refusing to execute the joint written instruction to the Escrow Agent attached to the Second IMS Health Letter.

90.     This action followed.

91.     As a prevailing party in this action, the SPA will entitle IMS Health to reimbursement for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of this action.

## COUNT I

### (Breach of the SPA)

92.     IMS Health repeats and realleges each and every allegation of paragraphs 1 through 91 inclusive as if fully set forth herein.

93.     The SPA, including its disclosure schedules, constitutes a binding and valid agreement by and among IMS Health, HDS, the Sellers, and the Sellers' Representative.

94.     IMS Health has performed all of its obligations under the SPA.

95.     The Sellers have breached the SPA in the manner described herein, including by, among other things, (i) failing to provide substantially complete drafts of post-Purchase Transaction tax returns and amendments to IMS Health at least 15 business days prior to the filing date of such returns, (ii) failing to obtain IMS Health's consent to the as-filed versions of those returns, (iii) failing to draft and file those returns in accordance with the SPA, and (iv) filing a tax return with the IRS that had the effect of wrongfully imposing tax liabilities on IMS Health attributable to the pre-closing period.

96.     As a direct result of the Sellers' breaches of the SPA, IMS Health has been damaged in an amount to be determined at trial, but in no event less than $2 million, plus prejudgment interest.

## COUNT II

### (Contractual Indemnification for Additional Tax Liability and Expenses)

97.     IMS Health repeats and realleges each and every allegation of paragraphs 1 through 96 inclusive as if fully set forth herein.

98.     Pursuant to the SPA, IMS Health is entitled to indemnification by the Sellers as described herein.

99.     Pursuant to the SPA, IMS Health is entitled to payment of such losses out of the Indemnity Escrow Fund.

100.    On January 8 and June 20, 2016, IMS Health made written demands on the Sellers' Representative for indemnification out of the Indemnity Escrow Fund pursuant to the SPA.

101.    By letters dated February 24 and July 14, 2016, the Sellers' Representative, and/or his agents, acting on behalf of the Sellers, refused to provide any such indemnification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff IMS Health prays for judgment against the Defendant Sellers, and an Order:

A.     awarding damages in favor of IMS Health against the Sellers for all damages sustained as a result of the Sellers' breaches in an amount to be determined at trial, but in no event less than $2 million, plus prejudgment interest thereon;

B.     awarding IMS Health its reasonable costs and expenses incurred in connection with the Claim and this action, including reasonable attorneys' fees, accountants' fees, advisors' fees, and expert fees; and

C.     granting such other and further relief as the Court may deem just and proper.

Dated:  September 22, 2016

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: _____

     Kenneth W. Taber
     Joshua I. Schlenger
     1540 Broadway
     New York, NY  10036-4039
     Tel.:  (212) 858-1000
     E-mail:  kenneth.taber@pillsburylaw.com
                joshua.schlenger@pillsburylaw.com

     *Attorneys for Plaintiff*
     *IMS Health Incorporated*